Order Entered.

Patrick M. Flatley
United States Bankruptcy Judge
Dated: Friday, December 18, 2009 3:22:31 PM

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| JONATHAN MCKINLEY OSBORNE, | ) | |
| | ) | |
| Debtor. | ) | Case No. 08-1218 |
| _____ | ) | |
| | ) | |
| JUANITA JEFFRIES | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 08-92 |
| | ) | |
| JONATHAN MCKINLEY OSBORNE | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## **MEMORANDUM OPINION**

Juanita Jeffreis's adversary complaint alleges that the money Jonathan McKinley Osborne (the "Debtor") obtained from her under a construction contract is excepted from the Debtor's discharge under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B) on the grounds that the Debtor either made misrepresentations to her about his ability or willingness to perform the construction work she required, or made false representations about his financial condition. Ms. Jeffries also contends that entry of the Debtor's Chapter 7 discharge should be denied under § 727(a)(4) on the basis that he omitted assets and/or undervalued assets on his bankruptcy petition and schedules.

The court held a trial on Ms. Jeffries's causes of action in Clarksburg, West Virginia on November 19, 2009, at which time the court took the case under advisement. For the reasons stated herein, the court will deny all counts of Ms. Jeffries's adversary complaint.

1

## I. BACKGROUND

Ms. Jeffries is single and lives alone. In 2005 she decided to add a two-story, 16' x 26' addition, with deck, to her home. In selecting a contractor to perform the work, two things were important to her: first, the contractor had to be someone she could trust, and second, the work had to be completed by December 2005 because she would be leaving for a period of time to attend her daughter's wedding in North Carolina.

After inquiring of her acquaintances, Ms. Jeffries learned that the Debtor did good work, was a "Christian" man, and would be available to begin work on her home in September 2005. Ms. Jeffries never asked the Debtor to produce a financial statement, balance sheet, credit report, or other financial document regarding his financial wherewithal to complete her construction project. On September 10, 2005, she accepted a construction proposal prepared by the Debtor. In the proposal, the completion date was changed to January 1, 2006, and the total price was $40,918, payable in five installments: (1) 15% or $6,137.75 to begin digging out for the basement, the pouring of footers, laying of block and installation of a french drain; (2) 20% or $8,183.16 to begin framing up the room addition, installation of trusses, sheet-in, tear-off shingles, install shingles and ridge vent; (3) 25% or $10,229.58 to begin installation of windows and doors, siding, gutters, sheet rock, basement floor, walls, wiring, and bathroom drain; (4) 35% or $14,321.41, payable on completion, for painting, installation of fixtures and appliances, trim, flooring, plumbing, and deck installation; and (5) 5% or $2,045 to haul away debris. In a further breakdown of materials and labor, the Debtor estimated the total cost of Ms. Jeffries's deck to constitute $9,718.72 of the overall contract price.

Ms. Jeffries's home is located on a hill. By December 2005, the Debtor had completed the majority of the construction, but the deck was still not built and excavation had left her yard a mess. In addition to the unfinished deck and yard work, Ms. Jeffries noted other work that was left unfinished in December. For example, a basement window needed to be framed out, and the french door needed handles and a finish. Due to bad weather and the fact that Ms. Jeffries's house was on a hill, the Debtor proposed to return in the spring to finish the job. By this time, Ms. Jeffries had paid the Debtor $29,550.99 of the total $40,918.30 contract cost.

In January 2006, Ms. Jeffries hired another individual to inspect the Debtor's workmanship. At that time, Ms. Jeffries believed that the Debtor did not do some of the work correctly. For

2

example, Ms. Jeffries stated that the floor joists were not properly reinforced.[1] Ms. Jeffries attempted to contact the Debtor on multiple occasions in January and February 2006 about finishing her construction job without success. Ms. Jeffries then contacted the West Virginia Attorneys General's office to lodge a complaint against the Debtor, and, after that course of action did not prove successful, she sued the Debtor in State Circuit Court. The Circuit Court case was in mediation when the Debtor filed his bankruptcy petition on July 31, 2008.

Meanwhile, Ms. Jeffries attempted to find another contractor to finish her construction job. In one estimate, the contractor stated that he would "fix" the Debtor's job and complete the construction contract, including building the deck, for $29,000. Of that amount, about $27,000 was allocated for the construction of the deck that the Debtor had promised to build for $9,718.72. Thus, about $2,000 was for the purpose of fixing the Debtor's alleged mistakes and for finishing the work the Debtor had not completed.

Regarding the Debtor's assets, in his bankruptcy petition the Debtor listed a ½ interest in 39 acres, a trailer, and an outbuilding/shed as having a value of $27,500. The Debtor purchased this property with his spouse on August 27, 2007, for $55,000. The property is located in Auburn, West Virginia, and, according to the Debtor, only poor people live in the town, no one wants to move there, and some houses have been for sale in the area for the past 20 years.

The 39 acres purchase by the Debtor and his spouse contain a catfish pay pond, commonly known as the Auburn Pay Pond. In August 2007, the pay pond was in business, but the pond had a serious leak such that when rain was sparse, the pond would quickly lose water. When it was in operation, the Debtor charged $12 per person to fish, and each person could take home up to 8 fish. When the Debtor collected $500 in entrance fees, he would purchase $500 in new catfish to stock the pond. New catfish cost $1.55 per pound, and he would stock two-to-four pound fish. Thus, if a person actually caught eight catfish, the Debtor would lose money. In addition to entrance fees, the Debtor made some money on bait and tackle sales,[2] and he sold soda, candy, and chips to his

---

[1] The Debtor explained that the way in which he installed the floor joists was proper and that his method of anchoring the joist was superior to that recommended by the Debtor's inspector.

[2] The Debtor stocked 5-6 rods. He testified that he would buy 30 dozen night crawlers for $0.75 per dozen, and sell them over three weeks for $1.50 per dozen.

3

customers. The pay pond was open two to three nights per week from April to October, and it averaged about twenty customers a day.

When the Debtor filed his July 31, 2008 Chapter 7 bankruptcy petition, the pay pond was still in operation; however, the Debtor shut the operation down that fall to drain the pond in an attempt to fix the leak. As of the date of trial on November 19, 2009, the required work was still unfinished and the pay pond was not in operation.

On Question 18 of his Statement of Financial Affairs, the Debtor identifies the Auburn Pay Pond, along with Osborne Construction, as a business in which he was engaged. On Question 2 of the Statement of Financial Affairs, the Debtor identifies the pay pond as a source of income, but states that expenses of the pay pond generally exceed income generated from it. As stated by the Debtor, he hoped to get to a point someday where the pay pond could make money, but he was not there yet. Regarding his statement of income and expenses (Schedules I & J), the Debtor lists $13,242 in gross monthly income from the operation of a business (which is not differentiated by pay pond and construction income), and lists $12,939.76 in monthly expenses. In a separate filing detailing his business expenses, the entries do not specifically include or exclude expenses related to the pay pond. On Schedule B, however, no personal property is listed with regard to the bait, tackle, food items, or fish that were located at the pay pond.

## II. DISCUSSION

Ms. Jefferies asserts that the Debtor defrauded her into paying for work that was never performed, or poorly performed, such that any debt owed to her should be excepted from the Debtor's discharge under 11 U.S.C. § 523(a)(2)(A) and (B), and that entry of the Debtor's discharge should be denied as to all creditors on the basis that the Debtor undervalued his pay pond property, did not properly account for income received from that operation, and failed to list his personal property associated with that business.

### A.    § 523(a)(2)(A)

The basis for Ms. Jeffries's § 523(a)(2)(A) cause of action is that the Debtor defrauded her into paying him money for work that was not completed or not completed properly. More specifically, she alleges that the Debtor misrepresented his ability to perform the work promised in their contract, misrepresented his financial ability to complete the work, and misrepresented the fact that he would return to finish the work in the following spring after he made the determination that

4

work should stop in December due to the nature of Ms. Jeffries's property and the inclement weather. The statute provides:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt–
>
> . . .
>
> > (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by--
> > > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

§ 523(a)(2)(A).

Not all debts incurred as a result of fraud fall within this exception to discharge; rather, this exception only includes those "debts in which the debtor used fraudulent means to obtain money. . . ." *Nunnery v. Rountree (In re Rountree)*, 478 F.3d 215, 219 (4th Cir. 2007). The intent of § 523(a)(2) is "to protect creditors who were tricked by debtors into loaning them money or giving them property, services, or credit through fraudulent means." *Id.* at 219-20.

The terms "false pretenses," "false representation," and "actual fraud" are to be interpreted according to the common understanding of those terms at the time § 523(a)(2)(A) was enacted. *E.g.*, *Field v. Mans*, 516 U.S. 59, 69 (1995) ("The operative terms in § 523(a)(2)(A) . . . carry the acquired meaning of terms of art. They are common-law terms, and . . . they imply elements that the common law has defined them to include."). What Congress meant when it used the terms can be derived from the generally shared common law, as set forth in *Restatement (Second) of Torts* (1976), which was published shortly before Congress passed the 1978 Bankruptcy Code. *Field*, 516 U.S. at 70-73; *see also Foley & Lardner v. Biondo (In re Biondo),* 180 F.3d 126, 134 (4th Cir. 1999) ("[W]e will follow the Supreme Court's lead and look to the Restatement to determine the elements required to prove that claim."). To define "actual fraud" the Supreme Court looked to the definition of "fraudulent misrepresentation" under the Restatement, which defines the tort as:

> One who fraudulently makes a misrepresentation of fact, opinion, intention, or law for the purpose of inducing another to act or to refrain from action in reliance upon it, subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.

*Restatement (Second) of Torts* § 525 (1976).

5

More recently, in an unpublished opinion, the Fourth Circuit in *Colombo Bank v. Sharp (In re Sharp)*, No. 08-1646, 2009 U.S. App. LEXIS 18200 at *4 (4th Cir. Aug. 14, 2009), the court stated that "a creditor's proof of actual fraud under subsection (2)(A) requires satisfaction of the elements of common law fraud: "'(1) false representation, (2) knowledge that the representation was false, (3) intent to deceive, (4) justifiable reliance on the representation, and (5) proximate cause of damages.'" (quoting *Rountree*, 478 F.3d at 218). Regarding a debtor's misstatement of intention, it is only "fraudulent if he does not have that intention at the time he makes the representation." *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997) (quoting *Restatement (Second) of Torts* § 530(1) (1976)).

In this case, Ms. Jeffries has failed to show that the Debtor made a false representation concerning his ability to complete the job, his financial wherewithal to complete the job, or his promise to return in the Spring to complete the job – much less that any one of these representations was made with the intent to deceive.

Regarding the Debtor's ability to complete the job, the Debtor holds a "general builder contractor's license" that authorizes him to complete contracts such as the one he executed with Ms. Jeffries. The Debtor is 39 years old, and has been a licensed contractor for the past 15 years. His license has never been suspended or revoked. At any one time, the Debtor has about three construction jobs on which he is working, and he employs five to six workers. Based on the Debtor's license and past experience, no basis exists in the record to conclude that the Debtor misrepresented his ability to complete Ms. Jeffries's construction project.

Regarding the Debtor's financial ability to complete the job, the Debtor testified that he had a $50,000 line of credit with a local construction vendor that he could use to finish Ms. Jeffries's job if he ran out of money. In fact, no proof exists that the Debtor was running out of money on her job because Ms. Jeffries paid the Debtor commensurate to the amount of work he performed. Ms. Jeffries withheld $11,367.31 of the total contract price to ensure that she would have money to pay for the deck, hauling, and landscaping that was necessary to finish the job. Under the construction contract, $11,763.72 was allotted for deck construction and clean-up. While Ms. Jeffries hypothesized that the Debtor may have underbid the job, the only evidence she presented on this point was an estimate by a handyman service, presented as an exhibit, that it could build her 560 square foot deck for $27,127.07. The major difference between the two estimates is that the Debtor

6

calculated that it would take five men one week to construct the deck, which had an associated labor cost of $1,800. The handyman service estimated its labor costs to be $16,050.21. The court has no basis to conclude that the Debtor's workers would be unable to construct the 560 square-foot deck within the week time-frame estimated by the Debtor, that the Debtor underbid her job, or that the Debtor did not have the financial ability to complete her construction project.

Finally, regarding the Debtor's allegedly false promise in December 2005 to return in the Spring of 2006 to finish her job, Ms. Jeffries demonstrated that she attempted to contact the Debtor on multiple occasions in January and February 2006, and that she did not hear back from the Debtor until May 2006 – after she filed a complaint with the State Attorney General's Office against the Debtor. For his part, the Debtor explained that he promised to return in the Spring, when Ms. Jeffries's hillside had dried out, and he could not return to her job when she was calling him in January and February. The Debtor stated that he intended to return when he made his representation in December 2005, and still intended to keep that promise in the Spring of 2006. Ms. Jeffries filed a complaint against him in May 2006 – during the springtime – before he had the opportunity to return and complete the job. Due to Ms. Jeffries's complaint with the Attorney General in May, and initiation of subsequent civil litigation, the Debtor decided not to return and finish the work. Moreover, the Debtor knew that he had already been paid commensurate with the amount of work he performed, and that Ms. Jeffries had retained $11,763.72 of the contract price, which, in his view, was sufficient to complete the construction of the deck and any other items that needed to be finished.[3] In sum, the court credits the Debtor's testimony that when he promised Ms. Jeffries in December 2005 that he would return to complete the job in the Spring of 2006, the Debtor intended to perform his promise such that it was not fraudulent when made.

**B.     § 523(a)(2)(B)**

Ms. Jeffries asserts that any debt owed to her by the Debtor should be excepted from his discharge under 11 U.S.C. § 523(a)(2)(B), which provides:

(a) A discharge under section 727 . . . of this title does not discharge an individual

---

[3] On the stand, the court found the testimony of the Debtor to be credible. He was forthright, and carefully answered the questions asked of him. His overall demeanor, body language, and consistent answers convince the court that he was making every effort to tell the truth.

> debtor from any debt–
>> . . .
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by--
>>> . . .
>> (B) use of a statement in writing--
>>> (i) that is materially false;
>>> (ii) respecting the debtor's or an insider's financial condition;
>>> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>>> (iv) that the debtor caused to be made or published with intent to deceive; . . . .

§ 523(a)(2)(B).

Subsection (2)(B) was designed to bar the bankruptcy discharge of a debt obligation that was induced by a false written statement of the debtor's financial condition. *Field,* 516 U.S. at 66. In order to satisfy subsection (2)(B), a creditor must prove five elements: (1) "use of a statement in writing," (2) "that [was] materially false," (3) "respecting the debtor's . . . financial condition," (4) "on which the creditor . . . reasonably relied," and (5) "that the debtor caused to be made or published with intent to deceive." § 523(a)(2)(B).

In this case, Ms. Jeffries failed to produce any written statement provided to her regarding the Debtor's financial condition. Consequently, Ms. Jeffries is not entitled to any relief under § 523(a)(2)(B).

**C.    § 727(a)(4)**

Under § 727(a)(4), Ms. Jeffries requests that the court deny entry of a discharge in the Debtor's case based on his purported failure to properly reflect the total value of his property, revenue from the pay pond, the purchase of fish, or other items that he sells. Section 727(a)(4)(A) provides:

> (a) The court shall grant the debtor a discharge, unless--
>> . . .
>> (4) the debtor knowingly and fraudulently, in or in connection with the case--
>>> (A) made a false oath or account . . . .

§ 727(a)(4)(A).

8

In determining if grounds exist to deny entry of discharge under § 727(a)(4), the court is to construe the provision liberally in favor of the debtor and strictly against those who object to entry of discharge because § 727(a) imposes an extreme penalty for wrongdoing. *E.g.*, *State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996) ("Clearly, § 727 imposes an extreme penalty for wrongdoing. [I]t must be construed strictly against those who object to the debtor's discharge and 'liberally in favor of the bankrupt.'"). The court must keep in mind, however, that "the very purpose of certain sections of the law, like [§ 727(a)(4)], is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs." *Palmacci v. Umpierrez (In re Umpierrez)*, 121 F.3d 781, 786 (1st Cir. 1997). The party objecting to discharge has the burden of proof by a preponderance of the evidence. Fed. R. Bankr. P. 4005.

An allegation that a debtor has made a false oath or account in connection with a case, especially when it concerns a debtor's schedules is important. Bankruptcy relies heavily on self-reporting by debtors. A debtor's signature avowing to the truth and correctness of the bankruptcy petition, schedules of assets and liabilities, and statement of financial affairs is undertaken on penalty of perjury. Fed. R. Bankr. P. 1008 ("All petitions, lists, schedules, statements and amendments thereto shall be verified or contain an unsworn declaration as provided in 28 U.S.C. § 1746."). Truth in reporting is consonant with the purposes of bankruptcy, which is to "give[] the honest but unfortunate debtor . . . a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934); *In re Jarrell*, 189 B.R. 374, 377 (Bankr. M.D.N.C. 1995) (stating that bankruptcy does not afford a debtor a right to a "head start"). A debtor should make every attempt to report accurate information in the debtor's petition and schedules and "[n]either the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight." *In re Tully*, 818 F.2d 106, 110 (1st Cir. 1987).

Section 727(a)(4)(A) requires that a debtor "knowingly and fraudulently" make a false oath or account in connection with a bankruptcy case. An oath or account is made "knowingly" if a debtor knows the truth, but nonetheless failed to give information or gave contradictory information. *Hamo v. Wilson (In re Hamo)*, 233 B.R. 718, 725 (B.A.P. 6th Cir. 1999). An oath or account is made fraudulently when the debtor "intended to induce the reader or recipient of the statements and

9

schedules, to a particular course of action or forbearance, via reliance on the omission or misrepresentation in the document's entries." *Bernhardt v. Radloff (In re Radloff)*, No. 08-5013, 2009 Bankr. LEXIS 3425 at *8 (Bankr. D. Minn. Oct. 8, 2009). False statements or omissions that are made by honest mistake are not a sufficient basis for denying entry of discharge, but the existence of multiple falsehoods can constitute reckless indifference to the truth and, therefore, can provide the requisite intent to deceive required for an oath or account to be fraudulent. *In re Beaubouef*, 966 F.2d 174, 178 (5th Cir. 1992) ("[T]he existence of more than one falsehood, together with [the debtor's] failure to take advantage of the opportunity to clear up all inconsistencies and omissions when he filed his amended schedules, constituted reckless indifference to the truth and, therefore, the requisite intent to deceive.").

In this case, there is no question that the Debtor's statements in his petition, schedules, and statements are made under oath. Fed. R. Bankr. P. 1008 ("All petitions, lists, schedules, statements and amendments thereto shall be verified or contain an unsworn declaration as provided in 28 U.S.C. § 1746."). In varying degrees, however, Ms. Jeffries has failed to meet her burden of proving that the Debtor made a false oath or account, or that a false oath or account was made both knowingly and fraudulently.

Regarding the valuation of the Debtor's ½ interest in the pay pond property, the Debtor testified that he and his spouse purchased it in August 2007 for $55,000, meaning that his ½ interest would be $27,500 – the exact value he placed on his interest on Schedule A to his bankruptcy petition. At the time he purchased the property, the pay pond was an operating business, but he knew that the pond was leaking. The extent of the leak, however, was not fully known until the summer of 2008 when the Debtor determined that the pond would have to close for repairs during the fall. The Debtor did make some improvements to the property between the time he purchased it and the filing of his bankruptcy petition. For example, the Debtor enclosed an outdoor stage and made it a shed out of which he anticipates selling food, drinks, and fishing items to his customers. The shed, however, has no running water and, in the court's view does not appreciably increase the value of the property. In sum, the court finds that the Debtor's valuation of the pay pond property

10

was accurate to the best of the Debtor's knowledge, information, and belief.[4]

Regarding the disclosure of income from the pay pond property, the Debtor listed the pay pond on Question 18 of his Statement of Financial Affairs, as a business in which he was engaged. On Question 2 of the Statement of Financial Affairs, the Debtor identifies the pay pond as a source of income, but states that expenses of the pay pond generally exceed the income generated from it. As stated by the Debtor, he hoped to get to a point someday where the pay pond could make money, but he was not there yet. Regarding his statement of income and expenses (Schedules I & J), the Debtor lists $13,242 in gross monthly income from business operations (which is not further delineated in to pay pond and construction income), and lists $12,939.76 a month in expenses. In a separate filing detailing his business expenses, the entries do not specifically include or exclude expenses related to the pay pond. Accordingly, the Debtor disclosed his interest in the pay pond, stated that the pay pond's income did not exceed its expenses, and calculated his total monthly business income and expenses. If Ms. Jeffries or another creditor wanted more information about his business activities, she could have scheduled a Rule 2004 examination, or probed the Debtor about the subject more tellingly on cross examination.. Under the facts of this case, however, the court cannot conclude that Ms. Jeffries met her burden of showing that the Debtor's statements and schedules concerning his interest in the pay pond and its revenue were false and/or made with an intent to deceive.

The last item that Ms. Jeffries identifies as constituting a false oath or account on the Debtor's schedules is his failure to list the personal property associated with his pay pond business. As the Debtor testified, he had five or six rod and reels for sale, some bait and tackle, food items, and a pond with catfish. None of these items were listed on Schedule B, the Debtor's schedule of

---

[4] Ms. Jeffries attempted to establish the value of the pay pond as a business by comparing it to other pay ponds in West Virginia through a type of market analysis. Ms. Jeffries is not an appraiser and was not qualified as an expert on the valuation of businesses. Moreover, even if the court were to consider Ms. Jeffries market analysis, it is only an estimate of the gross revenue that might be received by those other businesses based on admission price and a projection of the average number of customers. No account was made for business expenses, or whether the pay pond business had a negative or positive impact on real property value.

personal property.[5] The Debtor also testified, however, that in the summer of 2008, he learned that the pay pond had a significant leak that was in need of repair. At times, the water level was so low that the catfish struggled just to stay alive, and the Debtor stated that he allowed some persons to fish for free because he could not justify charging them a fee when the fish were not biting. When the Debtor drained the pond in October 2008, he found very few fish. While the court believes that the Debtor should have disclosed the personal property associated with the pay pond on his schedule of personal property, the court does not believe that this omission from his schedule was made with the intent to deceive.

### III. CONCLUSION

For the above stated reasons, the court will deny the relief sought in Ms. Jeffries's adversary complaint and will dismiss this case.

---

[5] The record is unclear as to the nature of the Debtor's ownership interest in these items of personal property. The Debtor purchased the real property with his spouse and she presumably had an ownership interest in the pay pond business too.